OPINION OF THE COURT
Frederick B. Bryant, J.
In this action the plaintiffs seek to recover damages for alleged medical malpractice on the part of the defendant. The defendant has moved for a dismissal of the complaint pursuant to CPLR 3211 (subd [a], par 7) and for summary-judgment in her favor pursuant to CPLR 3211 (subd [c]) and 3212.
The infant plaintiff, James Davis, was enrolled as a student in Maine-Endwell Central School District. He was the subject of frequent complaints on the part of teachers and classmates concerning his aggressive and disruptive behavior. He also demonstrated poor scholastic achievement. His parents, the plaintiffs Norman Davis and Harriet Davis, attributed his problem to learning difficulties involving visual-motor-perceptual problems as well as delayed or defective auditory development. In an effort to *890 overcome this difficulty James was given special tutoring and was placed in a nonclassroom environment for study and instruction during part of his school time.
When the behavioral and learning problems persisted, however, the Committee on the Handicapped for the Maine-Endwell School District determined that James was “emotionally handicapped” and on May 23, 1978 he was transferred out of the school to another type of educational placement.
The plaintiffs challenged this determination and sought a reconsideration by the Committee on the Handicapped. The school district authorities retained the defendant to examine James and advise the Committee on the Handicapped as to her opinion concerning his condition. The defendant is a doctor of medicine specializing in psychiatry and practicing her profession in Binghamton, New York. At the request of the Committee on the Handicapped she met with James and his parents on three occasions and reported the result of these interviews in letters to Mr. Fred Trzcinski, the Supervisor of Special Education, Board of Cooperative Educational Services (BOCES). A copy of the first of such letters was sent to James’ mother.
On January 17, 1980 the defendant met with the Committee on the Handicapped at which time the parents of James were present. The committee considered a number of reports and other materials concerning James and also discussed the boy’s problems with his teacher, the BOCES program supervisor and the defendant. At the conclusion of the meeting the committee determined that James should be classified as “emotionally handicapped” and placed on home tutoring pending availability of day school placement.
The plaintiffs objected to such classification and an impartial hearing officer was selected to determine whether the recommended educational placement of James made by the school district authority should be upheld. At this hearing the defendant testified under oath concerning her examination of James and as to her opinion that he was emotionally handicapped. The defendant was cross-examined by the plaintiffs’ counsel at great length and three *891 expert witnesses were called by the plaintiffs to express opinions in contradiction to that given by the defendant. The hearing officer upheld the determination of the Committee on the Handicapped of the Maine-Endwell Central School District and his decision in this respect was affirmed on appeal by the Commissioner of Education.
As the basis of their claim of malpractice on the part of the defendant, the plaintiffs allege that the defendant failed to conduct a proper examination of James and neglected to thoroughly investigate his background and behavior and that based on such negligent examination the defendant expressed an erroneous opinion to the effect that James was “emotionally handicapped”. Plaintiffs further allege that they have been damaged by the defendant’s testimony before the hearing officer. The alleged damage consists of humiliation and emotional injury and expenses incurred as a result thereof.
The defendant contends that this action is not maintainable because there was never any physician-patient relationship between herself and James or his parents. She asserts that she examined James at the request of the Committee on the Handicapped solely for the purpose of giving the committee the benefit of her opinion as to his mental and emotional condition. The defendant asserts that she never treated James for any mental or physical condition and was never consulted by either James or his parents for purposes of treatment and that neither James nor his parents relied in any respect on her diagnosis of his condition. The papers submitted to the court, in fact, disclose that James was a patient of a Dr. Green who prescribed medication for him. The only answer to the plaintiffs’ contention is the assertion by the plaintiff Harriet Davis in her affidavit verified August 25, 1981 that she cannot understand why the defendant is disclaiming the doctor-patient relationship. However, she states in that same affidavit that the plaintiffs “permitted” the defendant to see James for the purpose of determining what if any psychiatric problems he had.
This motion presents a problem of first impression insofar as counsel for the defendant and the court have been able to determine. No case has been found where an *892 attempt has been made to impose liability for malpractice under the circumstances presented here.
A claim for damages arising from medical malpractice is based on an assertion that the physician engaged to treat a patient or to make an examination for the purpose of treatment owes that patient a duty to use the requisite standard of medical skill to accomplish the objective for which he has been employed. This duty is owed to the patient by or for whom he was retained. The court agrees with the plaintiffs’ contention that such relationship does not have to be a fee-paying relationship nor that the doctor has to be retained by the patient himself. In support of this principle the plaintiffs’ counsel cites the case of DuBois v Decker (130 NY 325) where the patient received medical attention at public expense. But while the physician’s motion to dismiss a malpractice action brought by the patient on the grounds that he had not been employed by the plaintiff was denied, the court emphasized (supra, p 332) that the doctor had been employed “to attend and treat patients” sent to the public almshouse.
The defendant here was not retained by anyone to treat James or to diagnose for the purpose of treatment. The defendant was retained by the Committee on the Handicapped solely for the purpose of furnishing that body with a professional opinion for its guidance. The situation is exactly the same as that in a personal injury litigation where the plaintiff submits to an examination by the defendant’s doctor in order that the plaintiff’s claim for damages can be rebutted at trial. The insufficiency of such examination may affect the weight of the professional opinion expressed on trial but it certainly gives rise to no claim for malpractice since no physician-patient relationship existed.
The courts have recognized the essentiality of the physician-patient relationship as the basis for an action for malpractice in Mrachek v Sunshine Biscuit (308 NY 116) and Chiasera v Employers Mut. Liab. Ins. Co. of Wis. (202 Misc 2d 877).
In Mrachek the plaintiff applied to the defendant for a job and was required to submit to an examination by a doctor employed by the defendant during the course of *893 which examination she was injured. The court held that had the doctor’s negligence occurred in the course of treatment by him he would be liable as an independent contractor. However, the court held in this case that the plaintiff was not seeking treatment and that there was therefore no physician-patient relationship. The employer was held to be liable for the acts of its employee on an ordinary negligence theory.
In Chiasera the plaintiff was injured while being examined by a doctor retained by the employer in connection with a workers’ compensation claim. Suit for the injury was commenced against the doctor after expiration of the Statute of Limitations for a malpractice action but within the time limitation for a negligence action. The defendant moved to dismiss the action as time barred. The court in denying the motion pointed out that the physician had not examined the plaintiff for the purpose of treatment but solely to evaluate the merits of the plaintiff’s claim and that such examination is similar to the physical examination of a plaintiff in a personal injury action to enable the defendant to challenge the plaintiff’s physical condition at trial. The court held that such an examination is to be considered as adverse to the plaintiff’s interest. Without the essential element of a physician-patient relationship which establishes the physician’s duty to treat the patient with professional medical skill theré can be no claim for medical malpractice.
The relationship between the plaintiff and the physician in the above cases is exactly similar to the relationship between the parties here. In each case the physician was employed by a third party to examine the plaintiff on behalf of such third party. There was no treatment or expectation of treatment and no diagnosis for the purpose of treatment. The reports of the examination in each case were given to the party which employed the doctor — not to the patient. The facts disclosed in the pleadings and by the documents submitted on the motion do not sustain the plaintiffs’ contentions that this is a claim based on malpractice.
The plaintiffs urge that the case of Kleber v Stevens (39 Misc 2d 712) is authority for holding that an examining *894 doctor owes a duty to the person examined to conduct such examination with reasonable care and that an action lies for failure to exercise such care. In this court’s opinion the Kleber case is not in point here. The defendant in that case made a determination pursuant to then section 74 and section 75 of the Mental Hygiene Law that the plaintiff was mentally ill and dangerous resulting in her commitment to a State mental hospital. It is noted that section 75 of the Mental Hygiene Law permitted a director of a hospital to receive and retain as a patient a person alleged to be medically ill on the certificate of one examining physician. Then section 72 of the Mental Hygiene Law sets forth the matters to be included in such certificate and requires that it be made under oath. It was plaintiff’s contention that the doctor had made little or no examination of her before issuing his certificate on the basis of which she was committed. The court held that under such circumstances there is a statutorily imposed duty on the physician to act with reasonable care and to follow in good faith rather than simply mechanically the procedures called for to bring about the loss of liberty resulting from a commitment based on his certificate. The duty in such case was to be measured by the consequences following from its improper performance. The duty imposed by the statute was to protect the plaintiff against unlawful incarceration. No such duty exists in the instant case.
There was, of course, a duty imposed on the defendant in this case not to inflict injury on the plaintiff, James Davis, other than injury resulting from malpractice. For a breach of such duty the doctor can be held liable on a theory of simple negligence. (Chiasera v Employers Mut. Liab. Ins. Co. of Wis., 101 Misc 2d 877 supra.) The court distinguishes between the simple negligence theory and the malpractice theory. The theory of simple negligence applies only to those cases where the alleged negligent act is readily determinable by the trier of the facts on common knowledge. The medical malpractice cases rest on duties which a doctor owes to his patient and the very nature of these duties requires evidence from expert witnesses. Thus in the instant case it would require convincing testimony from an expert witness to establish that the defendant *895 failed to exercise the requisite degree of skill in her examination of the infant plaintiff.
The requirement that the doctor be retained for purposes of care and treatment in order to bring about a physician-patient relationship is further demonstrated by the statute and case law concerning the privileged communication between doctor and patient. CPLR 4504 prohibits a doctor from disclosing information “which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity”. The cases in which the question as to the availability of the privilege have arisen support the distinction between a “treating” doctor and an “examining” doctor. (Smith v Di Cara, 42 AD2d 791; Sassower v Himwich, 236 NYS2d 491, affd 19 AD2d 946; Milano v State of New York, 44 Misc 2d 290.)
It is worthy of note that had the plaintiffs sincerely believed that a physician relationship existed they could have asserted their claim of privilege on the proceeding before the hearing examiner. Their failure to do so can be considered either as a waiver of the privilege or as a recognition that no physician-patient relationship existed.
In the opinion of this court the present action must be dismissed due to the absence of any physician-patient relationship which could form the basis for an action based on medical malpractice. But it is also the court’s opinion that there are other and perhaps more basic reasons for dismissal.
Although the plaintiffs claim that the defendant rendered medical services in the nature of diagnosis of James’ condition and that such diagnosis was negligently made, the real basis of their claim for damage is the defendant’s testimony as to her opinion given in a quasi-judicial proceeding before the hearing officer. The plaintiffs claim that the defendant’s testimony branded James as “emotionally handicapped” and resulted in the emotional stress and mental anguish for which they seek damages.
This court has been unable to find any case in which a plaintiff has attempted to sue a witness for damages allegedly resulting from his adverse testimony. To permit such an action would make it impossible to find any expert *896 witness willing to risk a lawsuit based on his testimony as to his opinions and conclusions before any tribunal. And such cause of action if permitted would lead to an endless stream of litigation wherein defeated litigants would seek to redeem loss of the main action by suing to recover damages from those witnesses whose adverse testimony might have brought about the adverse result. Such a situation is illustrated by the present action wherein the defendant’s testimony as to the conclusions reached from her examination of James, tested by cross-examination before the hearing officer, is sought to form the basis for recovering damages because of the adverse decision reached by the hearing officer and the Commissioner of Education on appeal.
The defendant’s testimony like that of any other expert witness was given for the purpose of assisting the tribunal hearing the dispute. It was not binding on anyone and could be accepted or rejected by both the Committee on the Handicapped or the hearing officer or the Commissioner of Education. It was thoroughly tested by cross-examination and was subject to the same rules concerning reliability as the rules of any other witness — including the experts called by the plaintiff. It was not controlling on the judgment of anyone. (See NY PJI 1:90.) If the plaintiffs have in fact been damaged because James has been classified as “emotionally handicapped”, such damage is attributable to those who made the decision to that effect. But an attempt to impose liability on the witness called upon to express her opinion based on whatever observation she made would strike a serious blow at our adversary system of deciding disputes on the basis of testimonial evidence.
The cases with respect to the privilege of witnesses against liability for libel clothe the witness with complete immunity provided the testimony given relates to the subject matter of the particular proceeding in which the witness testifies. But even beyond this there appears to be no civil action available against a witness for his adverse testimony, even in cases of perjury. The following comment from Prosser, “Law of Torts” (4th ed, § 114, pp 777-778) is the only reference to the privilege of a witness under the circumstances of this case which this court has been able to *897 find: “It [absolute immunity from civil suit] likewise has been conferred upon witnesses* whether they testify voluntarily or not, and even though their testimony is by affidavit or deposition. The resulting lack of any really effective civil remedy against perjurers is simply part of the price that is paid for witnesses who are free from intimidation by the possibility of civil liability for what they say.”
And the following statement by the court in Beggs v McCrea (62 App Div 39, 43) is likewise in point. “The defendant in this case did nothing more than to state to the court the facts within his knowlege which was considered to have a bearing upon the question as to whether the plaintiff should be allowed to continue as trustee, and certainly in the absence of express malice proper performance of this public duty should not subject the defendant to liability.”
In the instant case the defendant was called on to assist the Maine-Endwell Central School District in making the best decision possible for the infant plaintiff’s future education. She expressed her honest professional opinion based on what she determined was a sufficient examination of the plaintiff. The fact that such opinion is contrary to the preconceived opinion of the plaintiffs should not subject her to civil liability.
The defendant’s motion for a dismissal of the complaint pursuant to CPLR 3211 (subd [a], par 7) is granted. The defendant’s motion for summary judgment pursuant to CPLR 3212 is likewise granted. The action is dismissed.