### 75144. PEACE v. WEISMAN.
(368 SE2d 319)

BANKE, Presiding Judge.

The appellant and her husband (now deceased) sued the appellee physician for alleged medical malpractice. Following her husband's death, the appellant was named executrix of his estate and was substituted for him in that capacity. She appeals the grant of the appellee's motion for summary judgment.

In 1985, the appellant's husband, Mr. Peace, applied for social security disability benefits. The Disability Determination Service of the Georgia Department of Human Resources (DHR) required him to undergo a consultative medical examination to determine whether a previously diagnosed heart condition would prevent him from assuming his former occupation. The appellee, a board certified specialist in the areas of cardiology and internal medicine, conducted the consultative examination at the direction of the DHR for the sole purpose of rendering a medical opinion to the DHR concerning Mr. Peace's ability to work.

The appellee neither recommended any treatment nor rendered any advice to Mr. Peace during the course of the examination but, in response to his inquiry about the results of the examination, merely informed him that the information would be contained in a report to the DHR. Included in the subsequent report sent by the appellee to the DHR was an evaluation of a routine chest X-ray which had been taken as part of the examination. In this evaluation, the appellee noted that there was "a peculiar fullness in both hilar areas which may reflect prominent hilar lymph nodes."

Mr. Peace was subsequently advised by the DHR that his application for disability benefits had been denied on the basis of the physical examination. He did not request, nor was he provided, a copy of the appellee's report. Approximately four months after under-

going the consultative examination, Mr. Peace became aware of a lump in his neck, and soon thereafter he was diagnosed as having lung cancer. In April of 1986, despite months of cancer treatment, he died as a result of the disease.

The complaint alleges that the appellee committed medical malpractice by failing to diagnose Mr. Peace's lung cancer in a timely manner, thereby allowing the malignancy to progress to its terminal stages. In granting summary judgment to the appellee, the trial court determined as a matter of law that no physician-patient relationship had ever existed between the appellee and Mr. Peace and therefore that no action based on medical malpractice could be maintained. *Held*:

1. It is a well-settled principle of Georgia law that there can be no liability for malpractice in the absence of physician-patient relationship. "[T]here are three essential elements imposing liability upon which recovery is bottomed: (1) The duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure be the proximate cause of the injury sustained." *Hawkins v. Greenberg*, 166 Ga. App. 574, 575 (304 SE2d 922) (1983). See also OCGA § 51-1-27. "In such cases, called 'classic medical malpractice actions' . . . , doctor-patient privity is essential because it is this 'relation . . . which is a result of a consensual transaction' that establishes the legal duty to conform to a standard of conduct. [Cit.]" *Bradley Center v. Wessner*, 250 Ga. 199, 201 (296 SE2d 693) (1982), affirming 161 Ga. App. 576 (287 SE2d 716) (1982). See also *Clanton v. Von Haam*, 177 Ga. App. 694 (2) (340 SE2d 627) (1986); *Brumbalow v. Fritz*, 183 Ga. App. 231 (358 SE2d 872) (1987). The relationship is considered consensual where the "patient knowingly seeks the assistance of the physician and the physician knowingly accepts him as a patient." *Buttersworth v. Swint*, 53 Ga. App. 602, 603 (186 SE 770) (1936).

While the precise issue presented by this case appears to be one of first impression in Georgia, it has been held almost uniformly in other jurisdictions that a physician who has been retained by a third party to undertake a medical examination of an individual cannot be held liable to that individual for malpractice as a result of that examination, where he neither offered nor intended to treat, care for, or otherwise benefit the individual and did not injure him during the course of the examination. See *Johnston v. Sibley*, 558 SW2d 135 (Tex. Civ. App. 1977) (summary judgment granted to physician who evaluated employee's disability claim for workers' compensation insurance carrier); *Lotspeich v. Chance Vought Aircraft*, 369 SW2d 705 (Tex. Civ. App. 1963) (physician conducting pre-employment physical not liable in malpractice for failing to inform examinee that X-ray disclosed tuberculosis); *Keene v. Wiggins*, 69 CalApp3d 308 (138

CalRptr 3) (1977) (physician's alleged failure to advise workers' compensation claimant of a medical condition did not give rise to a cause of action for medical malpractice). A different result is, of course, mandated where the physician did assume the role of treating the patient. See, e.g., *Phillips v. Good Samaritan Hosp.*, 65 Ohio App. 2d 112 (416 NE2d 646) (1979); *Betesh v. United States*, 400 FSupp. 238 (D. D.C. 1974); *Keene v. Methodist Hosp.*, 324 FSupp. 233 (N.D. Ind. 1971).

While Mr. Peace testified prior to his death that he believed a physician-patient relationship had existed between himself and the appellee during the consultative examination, we must agree with the trial court that the objective evidence negated the existence of such a relationship as a matter of law, leaving no basis for an inference that the appellee was acting on Mr. Peace's behalf at any time during the examination. Accord *Buttersworth*, supra, 53 Ga. App. at 603. It follows that the appellant cannot recover on the basis of professional malpractice.

2. The appellant contends that, pursuant to OCGA § 51-1-27, the appellee was under an absolute statutory duty to perform his services in a skillful manner, regardless of whether a physician-patient relationship existed. That Code section provides as follows: "A person professing to practice surgery or the administering of medicine for compensation must bring to the exercise of his profession a reasonable degree of care and skill. Any injury, resulting from a want of such care and skill shall be a tort for which a recovery may be had." However, the statutory duty imposed therein has never been deemed to arise independently of the physician-patient relationship. "[B]efore a plaintiff may recover on the theory that he received negligent treatment from a defendant physician, the plaintiff must show that a doctor-patient relationship existed between them" *Bradley Center v. Wessner*, supra, 250 Ga. at 201. Thus, OCGA § 51-1-27 does not address the situation before us, since the appellee did not undertake to perform any service for Mr. Peace. In the absence of a physician-patient relationship, the appellee's only duty to Mr. Peace was to conduct the examination in such a manner as not to injure him. Accord *Johnston v. Sibley*, supra; *Keene v. Wiggins*, supra; *Rogers v. Horvath*, 65 Mich. App. 644 (237 NW2d 595) (1975).

3. Relying on *Bradley Center v. Wessner*, supra, the appellant contends that the appellee may be held liable for the violation of a duty owed to the public at large to avoid injuring anyone who might forseeably be affected by his acts and omissions in a professional capacity. The defendant-physician in *Wessner* was sought to be held liable for the death of an individual killed by a mental patient whose temporary release from confinement had been authorized by the physician. The court held that where, in the course of treatment, a physi-

cian exercises control over the freedom of a mental patient, and where it is reasonably forseeable that the patient will cause bodily harm to others if released from confinement, a person so injured may maintain a cause of action against the physician, regardless of privity. While the court cautioned that physician-patient privity continued to be essential in "classic medical malpractice actions," it determined that the legal duty at issue in that case was not that of a doctor to a patient, but a manifestation of "the general duty one owes to all the world not to subject them to an unreasonable risk of harm." Id. at 201.

We find the reasoning in *Wessner* to be inapplicable to the present case. Here, the alleged injury arose not from the criminal act of an individual under the physician's care and control but from the physician's failure to advise the injured person of the results of a medical examination which the physician had performed on that person. This alleged breach of duty properly falls under the heading of "classical medical malpractice," for which privity continues to be an essential ingredient.

4. Finally, we reject the appellant's contention that the appellee may be held liable on the theory that he breached a duty created by certain Social Security Administration "guidelines" which are contained in a publication known as the "Disability Insurance State Manual." The alleged duty created by these guidelines was to notify an examinee's attending physician of any previously undiagnosed condition that might require immediate treatment. Assuming arguendo that these guidelines had the force of law, our review of the provisions in question, as cited to us by both parties, reveal that they apply not to the consultative examining physician but to the Disability Determination Service itself, i.e., to the administrators responsible for reviewing the examining physician's report. It follows that the appellant offered no valid basis for a recovery against the appellee in this case and that the trial court did not err in granting the appellee's motion for summary judgment.

*Judgment affirmed. Birdsong, C. J., McMurray, P. J., Carley, Sognier, and Beasley, JJ., concur. Deen, P. J., Pope and Benham, JJ., dissent.*

DEEN, Presiding Judge, dissenting.

I concur with Judge Benham's dissenting position that summary judgment for the defendant doctor conflicts with this State's "clear and unmistakable public policy favoring the preservation of life by those who are engaged in the medical profession." Blackstone identified the three basic rights of man as life, liberty, and property, the most important of which is life. "The right of personal security consists in a person's legal and uninterrupted enjoyment of his life, his

limbs, his body, his health, and his reputation . . . Life is the immediate gift of God, a right inherent by nature in every individual; and it begins in contemplation of law as soon as an infant is able to stir in the mother's womb." 1 W. Blackstone, Commentaries *125. The Supreme Court recognized this public policy favoring the preservation of life in *Jefferson v. Griffin &c. Hosp. Auth.*, 247 Ga. 86, 90 (274 SE2d 457) (1981) (Hill, P. J., concurring), where, after weighing the right of a mother to practice her religion and refuse surgery upon herself against her unborn child's right to life, the court found "in favor of her child's right to live."

I also am of the opinion that a physician/patient relationship resulted from the consultative examination in this case. The majority opinion's contrary conclusion may observe the letter of the law, but sucks it dry of any spirit.

In the strictest sense of the term or the "classic medical malpractice" scenario, no physician/patient relationship may have arisen out of Mr. Peace's submission to a consultative examination, because Mr. Peace did not seek out the defendant doctor for medical diagnosis or treatment and the doctor did not literally accept Mr. Peace as a patient. However, considering the realities of the situation, such a relationship existed in the instant case. Mr. Peace was trying to prove his entitlement to Social Security disability benefits. Although the consultative medical examination may have been required and paid for by the Georgia Department of Human Resources (DHR), from Mr. Peace's perspective he was being examined by a doctor, and his reasonable expectation was that the doctor would advise him of any physical ailments discovered by the examination. The whole purpose of the examination, after all, was to ascertain and evaluate the physical impairment of Mr. Peace. Under these circumstances, who in the world would not have expected the doctor to tell him of any abnormal findings? It strikes this writer as particularly outrageous to hold that such an examining physician has no duty to inform the examinee of his discovery of a life-threatening cancer. Certainly no great inconvenience would be visited upon a physician by requiring him to inform an examinee of such a critical finding.

Under the majority opinion, the examining physician has a duty to report his findings to DHR's Disability Determination Service (DDS), which in turn has a duty to notify an examinee's attending physician of any previously undiagnosed condition that might require immediate treatment. The only one left uninformed is the one most affected by the information. In this specific case then, Mr. Peace's interest in his health and life was sufficiently respected by the examining doctor's reporting to the DDS that the chest X-ray showed "a peculiar fullness in both hilar areas which may reflect prominent hilar lymph nodes," the significance of which understandably eluded the

DDS bureaucrats charged with making the disability determination. This system makes wonderful sense if its purpose is to guarantee that all the Mr. Peaces rest in peace at the earliest possible opportunity.

Under the facts of this case, the realities of the situation, including the expectations of the examinee and the purpose of the examination itself, favor finding a physician/patient relationship and imposition of a duty on the examining physician to divulge to the examinee any abnormal findings. To hold otherwise denies a remedy for a wrong, fosters irresponsibility on the part of such consulting physicians, and may allow unwitting bureaucrats to deprive a human being of a fighting chance to live.

Application of a strict definition of a physician/patient relationship produces the intolerable result reached by the majority opinion. Adherence to the strict definition conceivably could even sanction the nondisclosure of tumor or tuberculosis, or whatever, discovered in school children during routine health screenings conducted by a school doctor or nurse. The preferable and more enlightened approach would allow for flexibility in determining the existence of a physician/patient relationship in such situations. Accordingly, I must respectfully dissent.

BENHAM, Judge, dissenting.

While I readily agree that the majority opinion correctly states the rule of law applicable in this state as to medical malpractice claims, I see a clear and unmistakable need, based on case law interpretations and public policy consideration, for a change in the direction of the development of the law in this area; therefore, I am compelled by overriding considerations of fairness, as explained herein, to dissent.

Although the main opinion contains four divisions, appellant has only one enumeration of error, divided into four subparts. Since these subparts are inextricably intertwined with the main enumeration, this dissent will not address them separately. The question posed by this case is whether a physician who merely performs a consultative examination is answerable in damages to the examinee in a medical malpractice claim.

Appellant argues that OCGA § 51-1-27 and the Social Security Administration's Disability Insurance State Manual (DISM) 00601.215 provide an independent basis for liability by the physician. I agree with the majority opinion insofar as it says that there is no independent basis for liability under the facts of this case using the "classic medical malpractice" approach. However, we must look to statutory provisions, case law, and governmental regulations in an attempt to identify public policy considerations. In doing so, I find that while OCGA § 51-1-27 does not clearly cover the case sub judice, it

does evidence a public policy favoring recovery for "[a]ny injury resulting from want of . . . care and skill." Likewise, while DISM 00601.215 does not clearly require the consulting physician to report the results of his test to the patient, it does evidence a public policy favoring the reporting of such information.

The general rule regarding classic medical malpractice actions is outlined on page 698 of the majority opinion: "It is a well-settled principle of Georgia law that there can be no liability for malpractice in the absence of physician-patient relationship. 'There are three essential elements imposing liability upon which recovery is bottomed: (1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure be the proximate cause of the injury sustained. [Cits.]" This state has traditionally required that physician-patient privity must exist in order to maintain a classic malpractice action (*Buttersworth v. Swint*, 53 Ga. App. 602 (186 SE 770) (1936)), and the rule is generally followed by most other states, e.g., psychiatrist not liable for providing student placement report (*Davis v. Tirrell*, 110 Misc.2d 889 (443 NYS2d 136) (1981)); pediatrician not liable where he declined treatment but offered case management (*Sullenger v. Setco Northwest*, 74 Or. App. 345 (702 P2d 1139) (1985); consultative examiner not liable (*Rogers v. Horvath*, 65 Mich. App. 644 (237 NW2d 595) (1975); examiner of employee or job applicant not liable (*Lotspeich v. Chance Vought Aircraft*, Tex. Civ. App. 5th Dist. (369 SW2d 705) (1963); *Riste v. Gen. Elec. Co.*, 47 Wash.2d 680 (289 P2d 338) (1955).

As the above-cited cases show, "[o]rdinarily recovery for malpractice or negligence against a doctor is allowed only where there is a relationship of doctor and patient as a result of a contract, express or implied, that the doctor will treat the patient with proper professional skill and the patient will pay for such treatment, and there has been a breach of professional duty to the patient. Thus, it has been held that there is not a doctor-patient relationship between: (a) a prospective or actual insured and the physician who examines him for the insurance company; or (b) a prospective or actual employee and the doctor who examines him for the employer. There is, however, a broader, a more fundamental rule of long standing under which a physician may incur a tort obligation which is nonconsensual and independent of contract. This is the general rule that one who assumes to act even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all. Restatement, Torts, Sec. 325, says the law is that one who gratuitously undertakes to render services which he should recognize as necessary to another's bodily safety, and leads the other in reasonable reliance on the services to refrain from taking other protective steps, or to enter on a dangerous course of conduct . . . is sub-

ject to liability to the other for bodily harm resulting from the actor's failure to exercise reasonable care to carry out his undertaking. [Cit.]" *Hoover v. Williamson*, 236 Md. 250 (203 A2d 861, 863) (1964).

In certain instances where the physician-patient relationship has been called into question in other states, doctors have been subject to liability, e.g., injuries to patient during examination (*Jones v. Tri-State Tel. & Tel. Co.*, 118 Minn. 217 (136 NW 741)); furnishing inaccurate report that injures examinee's employment chances (*Armstrong v. Morgan*, Tex. Civ. App. 6th Dist. (545 SW2d 45) (1976)); furnishing inaccurate report to insurance company (*Brousseau v. Jarrett*, 73 Cal. App. 3d 864 (141 Cal. Rptr. 200) (1977)); and misrepresentation of examinee's true condition or concealment of evidence (*Hoover v. Williamson*, supra). In a federal case, *Betesh v. United States*, 400 FSupp. 238 (D.C. 1974), government physicians who examined decedent Betesh for an Army pre-induction physical were held liable for failing to disclose information to him about his abnormal X-ray until six months after the physicians became aware of it. During those six months, the tumor progressed from a highly curable state to a terminal one. In allowing the decedent's widow and parents to recover on their medical malpractice claim, the court held that a physician who undertakes a physical examination has a duty to disclose what he has found and to warn the examinee of any finding that would indicate that the patient is in danger and should seek further medical evaluation and treatment, and that that duty is stronger when the physician has no reason to believe that the examinee is aware of the condition and the danger. Applying an analysis that apparently parallels the one used in *Hoover v. Williamson*, supra, the court based its conclusion on the premise that "[h]aving assumed to act, the Government physicians were under a duty to act carefully, not merely in the conduct of the examination but also in subsequent communications to the examinee . . . [since the examinee] relies on the assumption that any serious condition will be revealed. [Cits.]" Id. at 246.

As early as 1955, in *Norton v. Hamilton*, 92 Ga. App. 727, 731 (89 SE2d 809) (1955), this court recognized certain public policy considerations and held: "The duty of a physician or surgeon to bring skill and care to the amelioration of the condition of his patient arises not only from the implied contract between the physician and his patient [cit.], but such duty also has its foundation in *public considerations which are inseparable from the nature and exercise of his calling* and it is predicated by the law on the relation which exists between physician and patient which is a result of a consensual transaction, and not necessarily one of contract. [Cit.] . . . 'Negligent failure to attend and treat a patient at a time when the need of treatment is known to the physician and there is opportunity to apply proper

treatment amounts to the same as negligent treatment and the physician is answerable for such failure.' [Cit.]" Id. at 731. (Emphasis supplied.)

In reviewing the case law of this state as it relates to public policy and medicine, I find the decision in *Emory Univ. v. Porubiansky*, 248 Ga. 391, 393-394 (282 SE2d 903) (1981), very illuminating and instructive. In declaring invalid a waiver of liability between a hospital and patient, our Supreme Court stated: "It is this strong interest of the state in the health and health care of its citizens which gives the state the right to regulate the health professional. [Cit.] 'The right to practice medicine is a conditional right which is subordinate to the state's power and duty to safeguard the public health, and it is the universal rule that in the performance of such duty and in the exercise of such power, the state may regulate and control the practice of medicine and those who engage therein, subject only to the limitation that the measures adopted must be reasonable, necessary, and appropriate to accomplish the legislature's valid objective of protecting the health and welfare of its inhabitants.' [Cit.]" The next year, in *Bradley Center v. Wessner*, 161 Ga. App. 576 (287 SE2d 716) (1982), aff'd, 250 Ga. 199 (296 SE2d 693) (1982), this court recognized that physicians are under an independent duty to control mental patients so as not to allow them to cause injury to others; and, in doing so, the court concluded that the imposition of the duty to control would not do violence to the public policy favoring readily accessible treatment for mental patients. *Bradley Center* is important because it allows recovery by a third party in the absence of privity between the injured party and the physician. "The legal duty in this case arises out of the general duty one owes to all the world not to subject them to an unreasonable risk of harm." Id. at 250 Ga. 201.

It is my view that the statutes, regulations, and case law reflect a clear and unmistakable public policy favoring the preservation of life by those who are engaged in the medical profession. It is my further understanding that while most claims of medical malpractice can be handled within the confines of the law developed under the "classic malpractice" approach, there should be an exception for cases, such as the case sub judice, in which some special relationship might have been established. If such a relationship is established, I believe that a "preservation of life exception" should be applied.

Under the persuasive authority of *Bradley Center*, supra, the following rule of law should be applied in the case before us: (1) Where a consultative examination gives rise to a special relationship involving the administration of medical tests and procedures, an independent duty arises from that relationship requiring the examiner to take reasonable steps to inform the examinee of any findings that pose a serious and imminent threat to the preservation of life; (2) this duty

must be breached by the examining physician for a cause of action to arise; (3) there must be legally sufficient evidence showing that the breach of this duty was the proximate cause of the injury; and (4) the examinee must suffer damages.

Since the rule announced here should only be applied in exceptional cases, I would reverse the grant of summary judgment and remand the case to the trial court for a determination not inconsistent with the rule announced herein.

I am authorized to state that Presiding Judge Deen and Judge Pope join in this dissent.

DECIDED MARCH 2, 1988 —
REHEARING DENIED APRIL 1, 1988 —

*Albert E. Jones,* for appellant.

*Paul J. Quiner, James M. Head, Jr., Judson Graves,* for appellee.

*Gene Mac Winburn, Gregory C. Sowell, Thomas W. Bennett,* amici curiae.