FIRST FINANCIAL SAVINGS & LOAN ASSOCIATION, Plaintiff,

v.

TITLE INSURANCE COMPANY OF MINNESOTA, et al., Defendants.

Civ. A. No. C81–416A.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 28, 1982.

Charles E. Watkins, Jr., William B.B. Smith, Atlanta, Ga., for plaintiff.

Joe G. Davis, Jr., William T. McKenzie, James S. Owens, Jr., Robert L. Goldstucker, Arnold Wright, Jr., J.M. Hudgins IV, James H. Fisher, Atlanta, Ga., for defendants.

SHOOB, District Judge.

## ORDER

This diversity action is before the Court on various motions for summary judgment. Before setting out the facts of the case, the Court will briefly identify the parties involved.

## PARTIES

1. Plaintiff First Financial Savings and Loan Association ("First Financial") commenced this action against the various defendants to recover funds lost as a result of its purchase of two loan packages from Heritage National Mortgage Corporation ("Heritage"). Heritage, which played a central role in the events giving rise to this litigation, filed for bankruptcy shortly after the sale to First Financial and is not a party to this lawsuit.

2. Defendant Title Insurance Company of Minnesota's ("Minnesota Title") involvement in this case arises from its issuance, through its agent defendant Southern Heritage Insurance Agency, Inc., ("Southern Heritage"), of title binders received by First Financial as part of the loan packages purchased from Heritage, as well as from an "insured closing letter" addressed to Heritage with respect to one of the loan packages.

3. Defendants Robert Silliman, an attorney, and the law firm of Chalker & Silliman (hereinafter referred to collectively as the "Silliman defendants") were retained by Heritage to handle the closing of one of the loan packages now a subject of this litigation.

4. Defendants G.C. Payne, Jr., an attorney, and the law firm of Payne, Stokes & Payne (hereinafter referred to collectively as the "Payne defendants"), were retained by Heritage to handle the closing of the second loan package involved in this suit.

## FACTS

Unless otherwise noted, the facts as narrated below are undisputed by the parties.

This lawsuit arises out of two loan/home sale closing transactions. The two transactions, hereinafter referred to as the "Harris loan" closing and the "Rogers loan" closing after the intended borrower/purchaser in each case, took place on March 10, 1978, and March 14, 1978, respectively. Although the specific facts of the two transactions differ in some respects, the essential facts relevant to plaintiff's claims are the same in both and are as follows.

Heritage, the lender in both transactions, retained the Silliman defendants to handle the Harris loan closing and the Payne defendants to handle the Rogers loan closing. In preparing for the closings, the attorneys searched the titles to the residential property that was to secure each loan and, pursu-

ant to Heritage's closing instructions[1] directing them to obtain title insurance through Southern Heritage, they each prepared a "Request for Binder" based on their respective preliminary title searches. Based on these requests, Southern Heritage, acting as the authorized agent of Minnesota Title, issued Minnesota Title title binders to Heritage with respect to each of the transactions.[2]

At each closing, the closing attorney (defendant Silliman and defendant Payne, respectively) had the intended seller execute a warranty deed conveying title to the intended purchaser/borrower, who in turn executed a promissory note payable to Heritage and a security deed conveying title to Heritage. Most important, each closing attorney executed a certification on a form provided by Heritage, which stated in part:

> This is to advise you that the captioned mortgage loan has been closed and disbursed for the amount listed above, advanced by Heritage National Mortgage Corporation, and secured by a loan deed properly executed by said borrower(s).

The loan deed is being filed of record with the recording clerk.

We certify that you hold a first and valid lien on the subject property.

Complaint, Exhibits F and K.

Also at the closing, based on drafts provided by Heritage along with its closing instructions,[3] the attorneys prepared checks drawn on their escrow accounts to pay for taxes, recording, real estate commissions, sellers' proceeds and cancellation of prior security deeds. The attorneys then explained to the parties at the closings that because the loan funds provided by Heritage were in the form of drafts, the closings would not be consummated until the respective drafts had been funded.[4]

On the next business day following their respective closings, the attorneys delivered the loan packages to Heritage.[5] These packages each included the original of the promissory note, a copy of the security deed, and the closing attorney's certification that the loan had been closed. Both attorneys informed Heritage at that time that the closing was conditional on its draft being funded.[6] Immediately following the

1. Prior to each closing Heritage sent both the Silliman and the Payne defendants a form document entitled "Loan Closing Instructions".

2. With regard to the Harris loan closing only, Minnesota Title had a further involvement. On October 13, 1977, Minnesota Title had issued to Heritage what is known in the mortgage and title insurance industry as an "insured closing service letter." This letter provided insurance coverage for Heritage in connection with closings of its real estate purchases and loans by the law firm of Chalker & Silliman when a Minnesota Title title insurance policy was specified and used in the particular transaction.

3. The exact circumstances concerning the draft instruments given by Heritage to the closing attorneys for the purpose of funding the transactions were different in the two loan transactions. In the Harris loan closing, Heritage had provided a first draft written for an incorrect amount and indicated that it would be replaced by a second draft. At the time of the closing, however, the Silliman defendants had not yet received the second draft. In the Rogers loan closing, Heritage provided a single draft on the day of the closing. The important fact is that in neither transaction did Heritage provide the closing attorneys with paid or certified funds.

4. The two closing attorneys handled this part of the transaction somewhat differently. Defendant Silliman delivered checks to both the real estate agent and the intended seller but explained that these checks were being tendered conditionally, contingent on receipt and funding of a second draft from Heritage. Silliman also mailed a check to the prior existing lienholder to pay off its loan, but the letter accompanying this check did not indicate that the payment was in any way conditional. Deposition of Robert B. Silliman, Exhibit 2. At the Rogers loan closing, on the other hand, with the exception of one check that was disbursed to Heritage, the prepared checks were not given to the respective parties but were retained and held by defendant Payne.

5. The Harris loan package was delivered to Heritage on Monday, March 13, 1978, following the Friday closing. The Rogers loan package was delivered on Wednesday, March 15, 1978, the day after the closing.

6. The parties disagree as to whether the transactions may properly be described as "escrow closings". Defendants have used this characterization throughout their arguments, but plaintiff objects that no escrow agreement was ever entered into and that delivery of the loan

respective closings, and by an assignment instrument dated the same day as each closing, Heritage sold both the Harris and Rogers loan packages to plaintiff First Financial for a slightly discounted amount, pursuant to an agreement between Heritage and plaintiff providing for such sales. At or shortly after the times of these assignments, plaintiff wired to Heritage the sums of $27,768.50 and $19,938.00 as the purchase prices of the Harris and Rogers loans, respectively.

Meanwhile, Heritage's drafts had been presented for payment by the closing attorneys and had been dishonored. Upon discovering that Heritage's drafts would not be funded, the attorneys notified the parties to their respective closings, as well as Heritage, that the condition of the closing had not been met and that the transaction could not be consummated.[7] They then proceeded to cancel or seek a return of the various documents and checks signed at the closings. As a result, in both cases, none of the deed instruments (neither warranty deeds from intended sellers to intended purchasers nor security deeds from intended purchasers to Heritage) was ever recorded, nor were the prior existing first security deeds ever satisfied or cancelled of record. Thus there was never a record sale or transfer of title in either transaction. The loan packages purchased by First Financial were therefore worthless.

Shortly thereafter, on March 29, 1978, Heritage filed its petition in bankruptcy. Plaintiff has filed a proof of claim against Heritage in that bankruptcy proceeding seeking to recover the monies it paid Heritage for the two loan packages. Plaintiff also seeks recovery of the same funds from defendants in this action on a variety of legal theories.

packages to Heritage belies the existence of any such arrangement. There is no dispute that no formal escrow agreement, either oral or written, was ever made. Nor is there any question that the loan packages were delivered to Heritage and that Heritage was informed the closings would not be final until its drafts had been funded. The Court need not decide whether these undisputed facts warrant the legal conclusion that the loans were closed in escrow.

## DISCUSSION

Based on the foregoing undisputed facts, both the Payne defendants and the Silliman defendants have moved for summary judgment. Plaintiff First Financial has responded with its own cross motions for summary judgment. Defendant Minnesota Title has also moved for summary judgment and plaintiff opposes this motion. Defendant Southern Heritage has not filed an answer to the complaint or otherwise defended against this action, and plaintiff accordingly seeks entry of default and default judgment as to it. In the discussion that follows the Court will consider first the motions with respect to the Payne and Silliman defendants and then turn to the motions regarding defendants Minnesota Title and Southern Heritage.

### I. The Silliman and Payne Defendants

#### A. Negligence Claims

In its motions for summary judgment, plaintiff submits that the Silliman and Payne defendants were negligent in delivering their certifications to Heritage before the loans had actually been funded, and that they are therefore liable to plaintiff for its detrimental reliance on the certifications.

The Silliman and Payne defendants do not dispute that they delivered documents to Heritage which certified (1) that the loan had been closed; (2) that the loan funds advanced by Heritage had been disbursed; (3) that the loan was secured by a loan deed properly executed, which was being filed for record; and (4) that a first and valid lien on the subject property had been created.[8] Nor do they dispute that none of these

7. It is not completely clear when the parties learned of the assignments to First Financial or when First Financial was first notified that the loans it had purchased from Heritage had never been finally closed. These facts, however, are not material to the issues raised by this case.

8. The text of the certification is quoted *supra* at 657.

certifications was true at the time they were made and that they did not subsequently become true. Finally, there is no dispute that plaintiff relied on these certifications in purchasing the loan packages from Heritage.[9]

While admitting these facts, defendants contend that nevertheless liability cannot attach to them, because they owed no legal duty to plaintiff. In support of their position, defendants cite cases holding that a claim against an attorney for negligence has as a threshold requirement that there be a duty arising from the attorney-client relationship. *E.g., Hughes v. Malone,* 146 Ga.App. 341, 344, 247 S.E.2d 107 (1978). Defendants also rely on other cases holding that professionals may not be held liable to third parties not in privity with them who rely on their negligent misrepresentations. *E.g., Howard v. Dun & Bradstreet, Inc.,* 136 Ga.App. 221, 220 S.E.2d 702 (1975); *Mac-Nerland v. Barnes,* 129 Ga.App. 367, 368, 199 S.E.2d 564 (1973); *Smith v. International Lawyers,* 35 Ga.App. 158, 132 S.E. 245 (1926). Defendants' arguments, both in opposition to plaintiff's motions for summary judgment and in support of their own motions for summary judgment, may thus be summarized as invocations of a rule of "no privity—no liability."

Plaintiff does not dispute a lack of privity between it and defendants but contends that this does not insulate defendants from liability. The Court agrees. Recent case law has established that, under certain circumstances, professionals owe a duty of reasonable care to parties who are not their clients, *i.e.,* not in privity with them. In a recent case interpreting Georgia law, the Fifth Circuit held that a psychiatrist who certified the disability of patients directly to an insurer, who in turn relied on the certifications in paying claims, could be held liable to the insurer for his negligent diagnoses. *North American Company for Life and Health Insurance v. Berger,* 648 F.2d 305 (5th Cir.1981) (Unit B). The *Berger*

court distinguished *MacNerland* and *Howard, supra,* relied on by defendants here, and followed instead the prior decision of this Court in *Alexander Hamilton Life Insurance Co. v. Trust Co. Bank,* C76–893A (N.D.Ga. July 29, 1979). In *Alexander Hamilton* this Court found a legal duty of care independent of privity where an architect erroneously certified to an insurance company the completion of a hotel, resulting in the company's purchase of a construction loan that subsequently went into default.

Defendants attempt to distinguish these latest cases on the ground that the certifications in issue there were made directly to the plaintiff/insurers. In a recent Georgia case, however, the court of appeals held that a professional could be held liable even where the certification was not made directly to the third party. In *Travelers Indemnity Co. v. A.M. Pullen & Co.,* 161 Ga. App. 784, 289 S.E.2d 792 (1982), defendant accountants had prepared financial reports for a firm, which then furnished them to plaintiff. Plaintiff guaranteed the firm's performance bond in reliance on the accountants' evaluations. In addressing the privity requirement laid down in *MacNerland* and *Howard, supra,* the court stated that

a third party is entitled to recover from an accountant, despite the absence of privity, where the third party is in a limited class of persons known to be relying upon representations of accountants. What those cases [*MacNerland* and *Howard*] do seem to hold is that if the third party is included only as a member of the general public who relies upon the representations of the accountant, there is too tenuous a relationship to warrant a legal liability being imposed upon an accountant whose negligence or fraud might have worked an injury. Travelers presented evidence, which if believed, would have warranted a conclusion that

---

**9.** Defendants do question plaintiff's reliance but have presented no evidence to contradict plaintiff's assertion of reliance, which is supported by the record. *See* Plaintiff's Answers to Defendant Minnesota Title's First Continuing Interrogatories, ¶ 8. Accordingly, there is no material issue of fact as to plaintiff's reliance. Fed.R.Civ.P. 56(e).

Pullen was informed by Yaksh that Travelers required financial statements and would rely upon those statements in deciding the propriety of issuing new performance bonds. Travelers presented a clear question of fact whether Pullen was aware of Travelers' interest in the financial statements, and thus whether Travelers would rely upon or be directly injured by its representations.

*Travelers Indemnity, supra,* at 786–87, 289 S.E.2d 792.

■ In the instant case there is uncontradicted evidence that the Payne and Silliman defendants knew an assignment of their loan packages by Heritage was to follow each of their respective loan closings, even if they did not know the specific identity of the intended assignee. The loan closing instructions issued to both the Payne and Silliman defendants indicated that an assignment was "TO FOLLOW",[10] and the closing attorneys were directed to "Collect fee for recording assignment to permanent investor." *See* Exhibit 2 to Payne deposition; Exhibit 1 to Silliman deposition.

Hence defendants do not dispute that they knew that Heritage would be assigning the loans to permanent investors such as plaintiff. In such circumstances it was clearly foreseeable that direct assignees such as plaintiff would rely on the accuracy of the closing attorneys' certifications. Accordingly, under Georgia law, the Payne and Silliman defendants had a duty to such assignees to exercise reasonable care in the execution and delivery of such certifications.[11] The Court thus agrees with plaintiff that the Payne and Silliman defendants are not entitled to summary judgment on plaintiff's negligence claims.

■ The mere existence of a duty, however, does not establish defendants' liability. Plaintiff must show that defendants breached their duty by negligently performing their professional services. Whether the delivery to Heritage of the loan packages containing their certifications, on the understanding that the closings were conditional on adequate funding being provided by Heritage, amounted to negligence is a disputed question that must be resolved by

10. In the case of the instructions received by defendant Payne, these words were followed by an exclamation point. *See* Exhibit 2 to Payne deposition.

11. The Court does not find this Court's earlier decision in *James T. Barnes Mortgage Co. v. Stewart,* C78–1310A (N.D.Ga. March 30, 1979), cited by defendants, to be persuasive authority against this conclusion. *Barnes* also involved an assignee's effort to recover from a closing attorney after the lender had failed to fund the purchased loan. This Court granted the attorney's motion for summary judgment, relying on such Georgia cases as *MacNerland, supra,* which it felt *Erie* bound to follow. *Barnes,* however, was decided before the recent developments in Georgia law reflected by *Berger, Alexander Hamilton,* and *Travelers Indemnity, supra.* Also, as plaintiff points out, the *Barnes* opinion evinces no facts comparable to the closing attorneys' undisputed knowledge in the instant case that Heritage would be assigning the loans to permanent investors such as plaintiff.

The Court also finds nothing contrary to its conclusion in the recent Georgia Court of Appeals decision cited by defendants, *Bradley Center, Inc. v. Wessner,* 161 Ga.App. 576, 287 S.E.2d 716 (1982). In holding there that no strict privity requirement applied in the medi-

cal malpractice area, the court noted that "[i]t is true that some cases in this state express adherence to a strict privity requirement in suits against professionals for the negligent performance of their professional services." *Id.* at 579, 287 S.E.2d 716, *citing Smith* and *MacNerland, supra.* This passing dictum in the course of finding the strict privity requirement inapplicable to physicians can hardly be said to establish the continuing vitality of the privity rule in Georgia, especially in light of the same court's decision only a little more than a month later in *Travelers Indemnity, supra.*

Finally, defendants cite *Kaiser Aluminum & Chemical Corp. v. Ingersoll-Rand Co.,* 519 F.Supp. 60 (S.D.Ga.1981), as upholding the privity requirement in Georgia law for negligence suits against professionals. However, as in *Barnes, supra,* the *Kaiser Aluminum* court relied on the older Georgia cases such as *MacNerland* and *Howard, supra.* It was decided before the Georgia Court of Appeals decision in *Travelers Indemnity, supra,* gave those earlier cases a more restrictive interpretation and defined a more liberal standard for finding a duty on the part of professionals toward third parties who rely on their negligent misrepresentations.

the trier of fact.[12]  Thus plaintiff's motions for summary judgment on its negligence claims must also be DENIED.  The issue to be resolved at trial with respect to these claims is whether defendants' actions in delivering their certifications to Heritage before the loans were actually closed breached the duty of reasonable care they owed to plaintiff as a potential assignee of the loans who would rely on such certifications.

### B.  *The Intentional Misrepresentation Claims*

Plaintiff has stated independent claims in its complaint based upon the closing attorneys' certifications and grounding liability on a theory of intentional misrepresentation.  Even those cases applying the strict privity requirement to third party suits against professionals have recognized an exception for a possible action in fraud.  *See, e.g., MacNerland v. Barnes,* 129 Ga. App. 367, 371, 199 S.E.2d 564 (1973).  Yet the Payne and Silliman defendants have virtually ignored this element of plaintiff's case and chosen to rely almost entirely on their privity arguments.

In opposition to plaintiff's misrepresentation claims, defendants apparently rely on the fact that their certifications were not directed to plaintiff but to Heritage, an independent third party.  However, the fact that the representations contained in the attorney's certifications were not made directly to plaintiff does not shield defendants from liability.  Indirect representations may nevertheless be a ground of liability in fraud, so long as it was intended or expected that they would be communicated to and acted upon by the complaining party or by members of the class to which he belongs.  *See Harrison & Seward v. Savage,* 19 Ga. 310 (1855); Restatement (Second) of Torts §§ 531–33.[13]

The Payne and Silliman defendants may therefore be held liable to plaintiff on a theory of intentional misrepresentation.  However, plaintiff is not entitled to summary judgment merely on the undisputed fact that defendants knew Heritage was planning to assign the loans to a permanent investor.  An essential element of any fraud claim is that defendant knew his representation was false.  Ga.Code Ann.

12.  Defendants Payne and Silliman, in their own affidavits, have attested that their actions were within the standards of care exercised by the legal community with respect to loan/home sale closings.  Plaintiff has submitted affidavits by another attorney with substantial experience in real estate closings, who attests that defendants' actions "reflect a want of such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the handling of real estate closing transactions."  *See* Affidavits of Richard E. Raymer, Exhibits A–1 and A–2 to Plaintiff's Memorandum in Reply to Supplemental Briefs of Payne and Silliman Defendants.  A clear issue of fact is therefore raised as to the culpability of defendants' actions.

13.  Section 531 of the Second Restatement states the general rule:

> One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.

The maker of the representation need not know the identity of the person whom it will reach, so long as he has reasons to expect that his misrepresentation will reach any of a particular class of persons.  *Id.,* comment e.  *See also id.,* illustrations 4 and 5 (professionals who provide erroneous certifications may be held liable to third parties whom they knew or had reason to know would rely thereon to their detriment).

Section 532 states a special application of the general rule:

> *Misrepresentation Incorporated in Document or Other Thing*
> One who embodies a fraudulent misrepresentation in an article of commerce, a muniment of title, a negotiable instrument or a similar commercial document, is subject to liability for pecuniary loss caused to another who deals with him or with a third person regarding the article or document in justifiable reliance upon the truth of the representation.

Arguably, the certificates executed by the Payne and Silliman defendants are "commercial document[s]" within the meaning of this section.  *See id.,* comment c ("The rule stated in this Section is usually applicable ... when false recitals are inserted in deeds or bonds").

§ 105–302. While defendants knew their certifications were false when delivered to Heritage, they could not have known they would still be false when the loan packages were assigned unless they knew or had reason to know that the assignments would take place before the loans had been finally closed. Accordingly, in order to make out its claim of intentional misrepresentation plaintiff must establish that defendants knew or should have known that Heritage would assign the loans before its drafts had been paid and the loans funded. Defendants clearly deny that they had any such knowledge, but there is some evidence that they should have known.[14] Therefore, a genuine dispute exists as to this material fact, and plaintiff's motions for summary judgment must also be DENIED as to the intentional misrepresentation claims. To succeed at trial on these claims, plaintiff must present evidence that defendants actually knew or reasonably should have known that Heritage would assign their loan packages before providing the funds necessary to make their certifications true.

## II. *Minnesota Title*

### A. *The Insured Closing Letter*

With respect to the Harris loan only, plaintiff seeks in Count Three of its complaint to hold defendant Minnesota Title liable for its loss on the basis of the insured closing service letter Minnesota Title issued to Heritage in connection with closings performed by the law firm of Chalker & Silliman. *See* note 2 *supra.* In pertinent part that letter provided:

> If our policy is to be issued, we will reimburse you for any loss of settlement funds transmitted to them [Chalker & Silliman] for your account due to their failure to account for their fraud or dishonesty as well as direct loss or damage resulting to you from their failure to comply with your written closing instructions, provided any such failure is reported in writing to this Company within a

reasonable length of time from the discovery of such failure or default.

Complaint, Exhibit L.

Plaintiff contends it may recover the loss from Minnesota Title under this letter either as Heritage's assignee or as a third party beneficiary of the insurance agreement. Defendant argues that regardless of whether plaintiff has any right of recovery under the letter as assignee or third party beneficiary, the letter's plain language clearly establishes as a matter of law that the insurance covers only loss of settlement funds and no other losses. Because Heritage never provided the closing attorneys with (good) settlement funds, defendant points out, there was clearly never any loss of such funds and thus no loss compensable under the insured closing service letter.

■ This was the conclusion reached by this Court in the case of *James T. Barnes Mortgage Co. v. Stewart,* C78–1310A (N.D.Ga. March 30, 1979), which also involved an assignee's claim against Minnesota Title on the basis of an insured closing service letter identical to the one involved here. There appears to be no reason in this case to depart from this construction of the relevant language. Thus, even assuming that plaintiff is a beneficiary under the insured closing letter, there was no loss for which the letter provided protection. Accordingly, defendant Minnesota Title's motion for summary judgment must be GRANTED as to Count Three of plaintiff's complaint.

### B. *The Title Binders*

■ In its complaint, plaintiff does not appear to make any direct claims for coverage under the Minnesota Title title binders that were included in the loan packages assigned by Heritage. However, it is possible to construe Counts One and Two of the complaint as including claims based solely on the title binders, and both parties have argued this issue in their briefs. After reviewing these arguments the Court concludes that Minnesota Title has no obligation to plaintiff under these binders.

---

**14.** For example, there is evidence that defendant Payne knew of Heritage's financial difficul- ties at the time of the closing. *See* Payne deposition at 35.

Although the coverage provided by the binders expressly runs to the "successors and assigns" of Heritage, see Complaint, Exhibits C and H, the commitment therein to issue final title policies is made subject to certain conditions. These conditions are the conveyance of title by warranty deed from the intended sellers to the intended buyers and by security deed from the latter to Heritage, and satisfaction and cancellation of the prior security deeds. It is undisputed that, because Heritage never funded either of the closings, title never passed from the intended seller to buyer or from the intended buyer to Heritage, nor were the prior security deeds ever satisfied and cancelled of record. Therefore, Minnesota Title never issued its final title policies to Heritage, nor was it obligated to do so, because the conditions precedent to issuance of the policies were never met. *Accord James T. Barnes Mortgage Co. v. Stewart, supra.* Accordingly, defendant is entitled to summary judgment on plaintiff's claims under the title binders.

### C. *The Agency Theory*

In Counts One and Two of its complaint plaintiff seeks recovery from defendant Minnesota Title with respect to both loan packages on the grounds that Heritage, Southern Heritage, and the Payne and Silliman defendants were all agents of Minnesota Title, which is therefore liable for their acts of negligence and/or fraud committed within the scope of their authority. Plaintiff's claims are based upon the following allegations:

(a) the closing attorneys acted negligently or fraudulently in delivering to Heritage the executed loan documents, including their certifications that the loans had been closed;

(b) the individual closing attorneys were agents of their law firms;

(c) the individual closing attorneys and their law firms were agents of Southern Heritage and Heritage;

(d) Heritage was alter ego and agent of Southern Heritage such that the acts of the former are attributable to the latter; and finally that,

(e) all defendants and Heritage were agents of Minnesota Title, acting within the scope of their agencies, and thus their acts are attributable to Minnesota Title.

Plaintiff contends that the various Minnesota Title documents in the record reflect a symbiotic working relationship between and among Minnesota Title, Heritage and Southern Heritage; and that this, together with the fact that the attorney defendants were on Minnesota Title's approved list of attorneys, supports an inference that the alleged agency relationships existed.

In its briefs, plaintiff focuses on the alleged relationship between Minnesota Title and the closing attorneys. Its position is summarized in the following passage:

Defendant's piecemeal analysis of the various Minnesota Title documents in the record casts insufficient light upon the true motivation and manner in which closing attorneys for Heritage loans were selected. First, as discussed previously, by insured closing service letter Minnesota Title had agreed to indemnify Heritage for losses occurring at closing, but *only if* (1) a Minnesota Title binder or policy were issued *and* (b) the closing attorneys were among those listed and approved by Minnesota Title. Pursuant to this agreement, Heritage retained Minnesota Title-approved closing attorneys, and in turn directed them to use Southern Heritage, secure in the knowledge that Southern would use Minnesota Title title insurance pursuant to Southern's Agreement with Minnesota Title. Through these sub-agent intermediaries acting at its direction and on its behalf, Minnesota Title was able to dictate and control the selection of particular closing attorneys, just as surely as if it had itself contacted them directly.

Plaintiff's Brief in Opposition to Defendant Minnesota Title's Motion for Summary Judgment at 13–14.

██ Minnesota Title contends that the various documents and other evidence in the record establish as a matter of law that the agency relationships alleged by plaintiff

did not exist. The Court tends to agree with defendant that plaintiff's agency allegations are tenuous at best; nevertheless, it is not convinced that there are no genuine issues of material fact remaining with respect to this issue. Accordingly, Minnesota Title's motion for summary judgment will be DENIED as to Counts One and Two of plaintiff's complaint, insofar as they allege liability on the basis of agency principles.

III. *Southern Heritage*

Defendant Southern Heritage Insurance Agency, Inc., has failed to plead or otherwise defend against this action. Plaintiff has therefore requested entry of default and default judgment in the liquidated amount of $47,706.50 as demanded in its complaint. Pursuant to Fed.R.Civ.P. 55, plaintiff has filed an affidavit in support of its request. Accordingly, the Clerk is DIRECTED to enter the default of defendant Southern Heritage Insurance Agency, Inc., and a default judgment in the amount of $47,706.50. Costs shall be taxed to defendant.

SUMMARY

In sum, plaintiff's motions for summary judgment are DENIED. Defendants Chalker & Silliman and Robert Silliman's motion for summary judgment is DENIED. Defendants Payne, Stokes & Payne and G.C. Payne's motion for summary judgment is DENIED. Defendant Minnesota Title's motion for summary judgment is GRANTED as to Count Three of the complaint. Defendant Minnesota Title's motion for summary judgment is also GRANTED as to Counts One and Two of the complaint insofar as they allege liability under Minnesota Title's title binders. Defendant Minnesota Title's motion for summary judgment is DENIED as to Counts One and Two of the complaint insofar as they allege liability on the basis of agency principles. The Clerk is DIRECTED to enter the default of defendant Southern Heritage Insurance Agency, Inc., as well as a default judgment in the amount of $47,706.50. Costs shall be taxed to defendant Southern Heritage.