**Lisa GRIJALVA, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 501CV–57–4(CAR).**

United States District Court, M.D. Georgia, Macon Division.

Oct. 31, 2003.

Stephen Neil Hollomon, Warner Robins, GA, for plaintiff.

William David Gifford, Robert D. McCullers, Melanie D. Wilson, Macon, GA, Brendan F. Flanagan, Columbus, GA, for defendant.

### ORDER OF THE COURT

ROYAL, District Judge.

Plaintiff filed this action pursuant to the Federal Torts Claims Act, 28 U.S.C. § 2671, *et. seq.*, against the United States of America under a "Bradley Center" theory of liability at Georgia law. The case was tried before this Court on October 27, 2003. After review of the arguments of the parties, the applicable law, and all evidence presented at trial, the Court finds that Plaintiff has failed to show that the alleged tortfeasor had either the requisite control or requisite knowledge necessary to give rise to the legal duty articulated in *Bradley Center, Inc. v. Wessner*, 250 Ga. 199, 296 S.E.2d 693 (1982) and it progeny. The Court further finds that, even if Plaintiff had shown that such a duty existed, Plaintiff likewise failed to establish any breach of this duty or that the tortfeasor's actions were a proximate cause of Plaintiff's injuries. As a consequence, the Court renders judgment for Defendant and makes the following Findings of Fact and Conclusions of Law pursuant to Fed. R.Civ.P. 52(a).

### FINDINGS OF FACT

During the time relevant to this action, Plaintiff Lisa F. Grijalva (Plaintiff) was married to Joseph L. Grijalva who was enlisted in the United States Air Force. They have three children. Mr. Grijalva served as a Senior Airman at Robins Air Force Base, Georgia from 1994 through the date of the incident at issue on September 15, 1997.

While Mr. Grijalva was stationed at Robins Air Force Base, the couple had marital problems, and Plaintiff took their children to her home in Arizona in August, 1997. With Plaintiff's consent, Mr. Grijalva followed her to Arizona to get his children and arrived there on September 1, 1997. Shortly after arriving in Arizona, Mr. Grijalva attempted suicide by taking an overdose of sleeping pills.

Immediately following the suicide attempt, Mr. Grijalva was temporarily hospitalized at the air base in Yuma, Arizona under the care of Rubina Ahmed, M.D., who placed him in the intensive care unit. On September 3, 1997, Mr. Grijalva was transferred from the intensive care unit to the medical floor where Cecil Rogers, Ph. D., a clinical psychologist, saw him for a psychological assessment and to assist in determining if it was safe to discharge him. During Mr. Grijalva's hospitalization in Yuma, Dr. Rogers discussed his condition by telephone with a psychiatrist, Dr. Angela Brown, and a licensed clinical social worker, Captain Cynthia Hampton, both of whom were commissioned officers in the United States Air Force and worked at the Robins Air Force Base mental health clinic.

While at the hospital in Arizona, Plaintiff and Mr. Grijalva received marital counseling, and, at that time, she specifically denied that her husband had ever been violent with her. Dr. Rogers did note that Mr. Grijalva expressed some impulsive responses to interfamilial stresses, but he explained that such impulsive reactions are common in many marriages and are "not unfamiliar even in many people who don't

engage in overt violence." Dr. Rogers did not perceive Mr. Grijalva to be a danger to himself, his wife or others, and did not see any basis to involuntarily hospitalize him or to delay his discharge from the hospital. Mr. Grijalva's doctors further cleared him for discharge, and in discussions with his commander, Colonel Smith, and Captain Hampton, the doctors in Yuma made it clear that Mr. Grijalva could safely drive back to Robins Air Force Base with his family, and that, in their opinion, there was no particular need to "med-evac" Mr. Grijalva to Georgia by aircraft. Dr. Rogers only suggested the need for a follow-up psychiatric exam for Mr. Grijalva after he returned to duty.

Mr. Grijalva was thereafter discharged from the Yuma Regional Medical Center on September 5, and given orders by his commander, Colonel Smith, to immediately return to Robins Air Force Base. Plaintiff and her children traveled to Georgia with Mr. Grijalva by automobile and arrived on Monday, September 8. Plaintiff described it as a quiet trip and stated that she did not have any fear of making the long trip back to Georgia with Mr. Grijalva and her children.

Upon their return, Mr. Grijalva went to work, and he and the family lived at home together until Friday, September 11, when the couple argued over divorce papers and his infidelity. During the argument, Mr. Grijalva pushed Plaintiff three times, she fell, then locked herself in a room, and called the Air Force security police. Upon arrival, the police asked Mr. Grijalva to leave the residence, and his commander, Colonel Smith, thereafter issued a seventy-two (72) hour no-contact order on the following Friday, September 12. The purpose of the no-contact order, which simply limited him from contact with his wife, was to permit a cooling-off period and was common in instances of marital disputes.

On September 12th, the same day that the no-contact order was made, Mr. Grijalva reported to the mental health clinic at Robins Air Force Base. Captain Cynthia Hampton, a licensed clinical social worker, saw Mr. Grijalva for a safety assessment, which essentially served as a follow-up visit after his attempted suicide and hospitalization in Yuma. At that time, Captain Hampton assessed Mr. Grijalva's mental status and questioned him about the increased friction in his marriage and the domestic argument that occurred on the previous evening, September 11th.

In response to Captain Hampton's various questions, Mr. Grijalva specifically denied that any physical violence had occurred during the September 11 argument and reported that the argument involved custody issues. Mr. Grijalva admitted to Captain Hampton that he was restless, had lost weight, and that he continued to have a depressed mood. Captain Hampton specifically asked him if he had any suicidal or homicidal ideations, including homicidal thoughts towards his wife, but he denied any. He further agreed to talk to someone if he had any suicidal or homicidal thoughts in the future and agreed to individual therapy with Captain Hampton. Mr. Grijalva likewise indicated that he wanted to take part in marital counseling in an effort to restore his marriage and agreed to discuss the possibility of counseling with his wife.

After concluding the safety assessment, Captain Hampton determined that Mr. Grijalva would not likely pose a danger to himself or anyone else. Captain Hampton considered possible diagnoses of adjustment disorder with depressed mood as well as a major depressive disorder, but neither potential diagnosis indicated that he might try to kill Plaintiff. Captain Hampton did, however, go on to provided Mr. Grijalva with appropriate phone num-

bers to call if he later decided he needed to talk with someone about suicidal thoughts and scheduled follow-up appointments at the mental health clinic, including a complete psychiatric work-up with Dr. Angela Brown on September 29, 1997. Mr. Grijalva then returned to his regular job on base that day.

Over the weekend following the Friday safety assessment, and unknown to Captain Hampton, Mr. Grijalva violated the 72–hour no-contact order by going home to take Plaintiff groceries. No violence occurred at that time, and Plaintiff had no fear of Mr. Grijalva or reason to believe he would harm her.

Unknown to either Plaintiff or any Air Force personnel, Mr. Grijalva had also purchased a hand gun over the weekend, and on Monday, September 15, Mr. Grijalva left work claiming that he had an appointment, went to his home, and shot Plaintiff as she slept. The gunshot injured her spinal cord and rendered her a paraplegic. Mr. Grijalva was later prosecuted for this criminal act and sentenced to thirty years in the United States Disciplinary Barracks at Fort Leavenworth, Kansas.

### CONCLUSIONS OF LAW

■ Under the Federal Tort Claims Act, the United States has waived its sovereign immunity in limited circumstances and can be liable for negligent or wrongful acts or omissions of government employees "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The United States, however, can only be liable if state law imposes a duty that the alleged government tortfeasor has breached. *See Tisdale v. United States,* 62 F.3d 1367, 1371 (11th Cir.1995). Accordingly, in deciding this case the Court must look to Georgia law.

■ To prevail in a negligence action in Georgia, plaintiff must prove:

(1) [a] legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injuries; and (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty.

*Bradley Center,* 250 Ga. at 200, 296 S.E.2d 693.

### I. LEGAL DUTY & BREACH

■ In this case, Plaintiff has stipulated that the only legal duty allegedly breached by Defendant is that duty announced by the Georgia Supreme Court in *Bradley Center, Inc. v. Wessner,* supra:

[W]here the course of treatment of a mental patient involves an exercise of control over him by a physician who knows or should know that the patient is likely to cause bodily harm to others, an independent duty arises from that relationship and falls upon the physician to exercise that control with such reasonable care as to prevent harm to others at the hands of the patient.

*Id.* at 201, 296 S.E.2d 693.

■ Of course, in Georgia "as a general rule, there is no duty to control the conduct of third persons to prevent them from causing physical harm to others." *Id.* at 201, 296 S.E.2d 693. However, in *Bradley Center,* following the Restatement, Torts 2d § 319, the Georgia Supreme Court established an exception to that general rule where a special relationship exists, i.e. "one who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the

third person to prevent him from doing such harm." *Bradley Center*, 250 Ga. at 201–02, 296 S.E.2d 693 (quoting Restatement, Torts 2d § 319). This conclusion follows the well-settled principle that negligence must be "predicated on what should be anticipated, rather than on what happened, because one is not bound to anticipate or foresee and provide against what is unlikely, remote, slightly probable, or slightly possible." *Amos v. City of Butler*, 242 Ga.App. 505, 506, 529 S.E.2d 420 (2000). "No matter how innocent the plaintiff may be, [s]he is not entitled to recover unless the defendant did something that it should not have done, or failed to do something that it should have done pursuant to the duty owed to the plaintiff." *City of Douglasville v. Queen*, 270 Ga. 770, 771, 514 S.E.2d 195 (1999).

█ Applying this law to the case at bar, the Court finds that Plaintiff has failed to establish that Defendant had a duty to prevent her injuries under *Bradley Center*. As alluded to above, the *Bradley Center* theory requires a two-fold analysis. *Spence v. United States*, 132 F.Supp.2d 1061, 1076 (M.D.Ga.2001) (citing *Ermutlu v. McCorkle*, 203 Ga.App. 335, 336, 416 S.E.2d 792 (1992)). To recover, a plaintiff must establish both (1) that the physician could exercise the requisite "control" over the mental patient; and (2) that the physician knew or reasonably should have known that the patient was likely to cause bodily harm to others. *Ermutlu*, 203 Ga. App. at 336, 416 S.E.2d 792. Plaintiff has failed to satisfy either part of this test.

A. *Plaintiff has Failed to Show that Captain Hampton had the Requisite "Control" over Mr. Grijalva*

█ As to the first element, the evidence fails to show that Captain Hampton, a licensed clinical social worker, exercised or had the authority to exercise the sort of control over Mr. Grijalva that would give rise to the duty to control his conduct. She never saw Mr. Grijalva as an inpatient, and he was never admitted as an inpatient while in Georgia. Mr. Grijalva came to her office as a voluntary outpatient, at the suggestion of his commander, for a follow-up visit after his attempted suicide and hospitalization in Yuma.

At no time during his return trip to Georgia, or up until the time of the shooting, did Mr. Grijalva meet the involuntary commitment standard according to O.C.G.A. § 37–3–1(9.1) (defining an inpatient as a person who "presents a substantial risk of imminent harm to [himself] or others"). All of the mental health care providers, who assessed Mr. Grijalva over this time period, including Captain Hampton, concluded that Mr. Grijalva did not pose a risk of imminent harm to himself or others. Plaintiff's expert, Dr. Donald S. Meck, Ph.D., also testified that even if Captain Hampton had gotten all the information that she could have learned from Mr. Grijalva and other sources, that information would not have been enough to physically detain him. Thus, as a mental health care provider conducting a limited safety assessment, Captain Hampton did not have the "legal authority to confine or restrain [Mr. Grijalva] against his will" under Georgia law. *Baldwin v. Hospital Authority of Fulton County*, 191 Ga.App. 787, 789, 383 S.E.2d 154 (1989); *see also Ermutlu*, 203 Ga.App. at 337, 416 S.E.2d 792.

The Court further notes that, even if Mr. Grijalva had exhibited the statutory condition for involuntary confinement, she alone could not have had him involuntarily committed. According to O.C.G.A. § 37–3–81, involuntary commitment of a mental patient requires the recommendation of the chief medical officer of the facility, along with the supporting opinions of two doctors or a doctor and a psychologist.

Captain Hampton is not the chief medical officer, a doctor or a psychologist.

Likewise, in her military capacity, even under the most grave circumstances, Captain Hampton has very limited authority. She only has the power to recommend some type of action to restrain Mr. Grijalva to his commanding officer. The commanding officer may then exercise her discretion, in light of the recommendation and everything else she knows about the situation, to determine what action is appropriate. Consequently, any recommendation that Captain Hampton could have made to Colonel Smith would not have bound Colonel Smith. Only Colonel Smith had the power to detain Mr. Grijalva.

■ While the Court of course recognizes that an officer in the U.S. Air Force has more "control" over an airman than a civilian medical provider has over a civilian patient, the Court finds that this is not the kind of control that *Bradley Center* contemplates, nor is it the kind of "special relationship" contemplated by the Restatement of Torts, 2d § 315. *Accord, Sage v. United States,* 974 F.Supp. 851, 862 (E.D.Va.1997) (finding that "subject to military orders or not," army officer was a mental patient, not a prisoner, and thus, "military doctors could not forcibly confine him once a reasonable medical determination was made ... that he no longer appeared to be a danger to himself or to others"). Rather, the type of control required in this instance is "the legal authority to confine or restrain a patient against his will." *Keppler v. Brunson,* 205 Ga. App. 32, 33, 421 S.E.2d 306 (1992). Nothing in the record shows that Captain Hampton had that degree of control under any circumstances, much less based on the benign information known to her about Mr. Grijalva's condition and intentions.

Plaintiff has therefore failed to show that Captain Hampton could exercise the requisite amount of "control" over Mr. Grijalva, which is necessary to satisfy the first prong of the two-part *Bradley Center* test. By the same turn, it is clear that because Captain Hampton did not have the legal authority to control or detain Mr. Grijalva, in this instance, there could not be any breach of a duty to do so.

B. *Plaintiff has Failed to Show that Captain Hampton Reasonably Should Have Known that Mr. Grijalva Posed a Danger to Others*

■ Regarding the second element of this *Bradley Center* claim, the requisite knowledge, counsel for both parties agreed that Captain Hampton did not have actual knowledge of any intended harm. Accordingly, the only issue at bar is whether Captain Hampton *reasonably should have known,* based upon the information before her, that Mr. Grijalva was likely to cause bodily harm to his wife or others.

In this case there is simply no evidence that Captain Hampton could reasonably have foreseen that Mr. Grijalva would shoot Plaintiff or anyone else. Plaintiff herself testified that she did not fear him at any time and that she did not think he would shoot her. Further, Mr. Grijalva had not made any threat to Plaintiff that was known to Captain Hampton or to anyone else in the Air Force. In fact, Mr. Grijalva testified that he had never contemplated harming Plaintiff until the day before he shot her, which was two days *after* his appointment with Captain Hampton. The only documented "violence" between Mr. Grijalva and Plaintiff involved a self-reported incident when he pushed her a couple of times four years earlier, in 1993, which was recorded in his medical records.

Clearly, this case is distinguishable from the circumstances in *Bradley Center.* In *Bradley Center,* the patient, who later shot and killed his wife and her paramour, was

a voluntary inpatient at a mental health care facility. *Bradley Center, Inc. v. Wessner*, 161 Ga.App. 576, 576–77, 287 S.E.2d 716 (1982). Upon admission to the facility, the *Bradley Center* patient reported:

> My wife is divorcing me, she has been having an affair with another man for more than two years now. I have caught her on numerous occasions with him. I hate this man, and want his life at least to suffer in some horrible way. I have attempted on occasion to carry this out. I am also harboring thoughts of even taking my wife's life. Just the sight of this man makes me want to do it. I now carry a weapon in my car in the hope of seeing him, and being in the right mood to kill him.

*Bradley Center*, 161 Ga.App. at 576, 287 S.E.2d 716. Moreover, on the very day that the *Bradley Center* patient was given an unsupervised pass to leave the hospital, he actually told nurses that he had a weapon and was just waiting for the right circumstances to use it. *Id.* at 579, 287 S.E.2d 716; *compare also Spence v. United States*, 132 F.Supp.2d 1061, 1076 (M.D.Ga.2001) (finding that the patient had a long history of violence, threats, incarcerations, and hospitalizations in mental institutions, and upon his admission to the hospital).

The facts of this case, however, are vastly different. Mr. Grijalva was not an inpatient, but a voluntary outpatient. He had no known history of serious mental illness or violence against others. Prior to the safety assessment with Captain Hampton, Mr. Grijalva had been treated and released from the care of a hospital in Arizona and the medical professionals there permitted him to drive home to Warner Robins, Georgia with his wife and children. Mr. Grijalva had not harmed or threatened to harm Plaintiff and had not previously expressed any intention to harm her.

Captain Hampton likewise conducted an appropriate safety assessment of Mr. Grijalva, during which he denied any suicidal and/or homicidal ideations, openly discussed the potential future of the marriage, and his desire to enter marital counseling. Mr. Grijalva had made no known threats of violence to his wife or to any other person and had not attempted to harm anyone other than himself. In fact, at that time, the only concern was whether Mr. Grijalva might harm himself again. Even Plaintiff's expert admitted that based on what Captain Hampton knew from her assessment of Mr. Grijalva, as reflected in her notes, there was no reason to believe that Mr. Grijalva was a risk to others.

Accordingly, this Court finds that Plaintiff has failed to establish that Captain Hampton reasonably should have known that Mr. Grijalva was a danger to others, based upon the information before Captain Hampton at the time of the safety assessment. Thus, because Plaintiff has failed to establish either part of the requisite two-prong *Bradley Center* test, the Court must conclude that Plaintiff has failed to show that Captain Hampton had a legal duty to protect her from an unreasonable risk of harm from Mr. Grijalva.

Likewise, there is no way that Captain Hampton could reasonably be charged with the "breach" of any duty to foresee an injury to Plaintiff. *See Baldwin*, 191 Ga. App. at 789–90, 383 S.E.2d 154. In *Bradley Center*, the Supreme Court of Georgia explained that the duty it was recognizing was distinct from a medical malpractice claim; in fact, they are ordinary negligence cases. *Bradley Center*, 250 Ga. at 204, 296 S.E.2d 693. In this case, however, Plaintiff apparently sought to use Dr. Meck as an expert on what the standard of care required, not simply on the question of what Captain Hampton should have known based on the information that she

had. As such, Plaintiff has tried to turn this into an issue of what Captain Hampton "would have known" if she had gotten more information and not an issue of what she "knew or reasonably should have known" based on what information she had. This goes beyond the scope of *Bradley Center* and brings into question what a professional standard or duty required Captain Hampton to ask and do in her assessment of Mr. Grijalva. This likewise shows a fundamental misunderstanding of the "Bradley Center" theory because the Supreme Court specified the parameters of the duty in terms of ordinary care and then explained what ordinary care requires under the circumstances of knowledge and control of a dangerous person who could reasonably be expected to harm a third party. *See id.*

However, even if Plaintiff could maintain a claim for professional negligence, the Court would find that Captain Hampton exercised that degree of skill and care ordinarily exercised by licensed clinical social workers under similar conditions and like surrounding circumstances in assessing Mr. Grijalva. *Blount v. Moore*, 159 Ga.App. 80, 81, 282 S.E.2d 720 (1981). Thus, the Court finds that, in this case, Captain Hampton could not be charged with the "breach" of any duty to foresee an injury to Plaintiff.

## II. CAUSATION

Furthermore, based upon the evidence presented, the Court finds that Plaintiff has failed to prove that Captain Hampton's conduct in this case was a proximate cause of her injuries. To prove proximate causation, a plaintiff must prove that the defendant's conduct was either the sole cause of the plaintiff's injury or put in operation other causal forces that were the direct and probable consequences of her acts or omissions. *Strickland v. DeKalb Hospital Authority*, 197 Ga.App. 63, 68, 397 S.E.2d 576 (1990). "A wrong-

doer is not responsible for a consequence which is merely possible, according to occasional experience, but only for a consequence which is probable, according to ordinary and usual experience." *Id.*

An important corollary to this principle of proximate cause applies in cases that involve criminal acts. "Generally, an independent, intervening, criminal act of a third party, without which the injury would not have occurred, will be treated as the proximate cause of the injury superseding any negligence of the defendant, unless the intervening act is a reasonably foreseeable consequence of the defendant's negligent act." *Id.* Because Mr. Grijalva committed the criminal act of shooting his wife and because that act was not reasonably foreseeable by Captain Hampton, his act of shooting Plaintiff was the sole proximate cause of her injury.

Moreover, even if this Court were to have found that Mr. Grijalva's criminal actions were foreseeable, as noted above, Plaintiff has failed to show that Captain Hampton had the authority to detain him. Captain Hampton, acting alone, did not have the authority to commit Mr. Grijalva involuntarily or even have him physically detained by military order. Thus, it is relevant that Plaintiff has failed to show either that Captain Hampton would have been able to get the necessary supporting opinions to involuntarily commit Mr. Grijalva, or that Colonel Smith would have actually placed Mr. Grijalva in incarceration if Captain Hampton made that recommendation.

It is unlikely that anything less than incarceration would have prevented this shooting. Mr. Grijalva clearly violated the first 72–hour no-contact order made by his commander. A second 72–hour no-contact order from Colonel Smith, which even Plaintiff's own expert considered too restrictive under the circumstances, would have likely done little, if anything, to keep

Mr. Grijalva away from his wife. The Court finds, therefore, that even if Plaintiff had proven the existence of a legal duty and the breach of such duty in this case, Plaintiff's negligence claim must still fail because she can not establish that Captain Hampton's conduct proximately caused her injuries.

### CONCLUSION

After weighing the evidence and applying the law, this Court concludes Plaintiff has failed to prove, by a preponderance of the evidence, that Defendant had a legal duty to protect her from an unreasonable risk of harm from Mr. Grijalva under *Bradley Center.* The Court further finds that, even if Plaintiff had shown that such a duty existed, Plaintiff likewise failed to establish any breach of this duty or that Captain Hampton's conduct was a proximate cause of Plaintiff's injuries, as required to prove negligence under Georgia law. This case must, therefore, be resolved in favor of Defendant.